## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

NICOLE M.,                                          Case No. 22-CV-1717 (JFD)

            Plaintiff,

v.                                                          **ORDER**

KILOLO KIJAKAZI, *Acting*
*Commissioner of Social Security*,

            Defendant.

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Nicole M. seeks judicial review of a final decision by the Commissioner of Social Security denying her applications for disability insurance benefits (DIB) and supplemental social security income (SSI). (Complaint 1 , Dkt. No. 1; Soc. Sec. Admin. R. (hereinafter "R.") 15–28.)[1] Plaintiff has several impairments, including anxiety, asthma, attention deficit hyperactivity disorder (inattentive type), bipolar disorder, depression, dissociative disorder, narcolepsy, post-traumatic stress disorder, and social anxiety disorder. (R. 19 (listing severe impairments).) The case is currently before the Court on the parties' cross-motions for summary judgment[2] (Dkt. Nos.

---

[1] The consecutively paginated Social Security administrative record is filed at docket numbers 15 and 15-1. The Court cites to that pagination rather than to the docket number and page assigned by the Court's CM/ECF system.

[2] On December 1, 2022, the District of Minnesota amended Local Rule 7.2, which governs procedures in social security cases, to conform to the Supplemental Rules for Social Security Actions Under 42 U.S.C. § 405(g). D. Minn. LR 7.2 advisory committee's note to 2022 amendment. The Supplemental Rules apply to actions filed on or after December 1, 2022. *Id.* (Dkt. No. 19.) Because Plaintiff filed this case before December 1, 2022, the procedures established by the previous version of Local Rule 7.2 apply, including a

17, 19). The ALJ's decision does not show that she considered the consistency and supportability of the opinions of two providers who gave medical source statements. (*See* R. 25.) Rather than read a consistency and supportability analysis into an opinion where none exists, the Court remands the case to the ALJ to further explain why she found these sources to be less than fully persuasive. *See John P. B. v. Kijakazi*, No. 22-CV-1801 (MJD/JFD), 2023 WL 5516154, at *6 (D. Minn. July 17, 2023), *R&R adopted*, 2023 WL 5515986 (D. Minn. Aug. 25, 2023) (holding that it was legal error for ALJ to not address the supportability and remanding case).

## I.    Background

Because the record in this case is over a thousand pages long, the Court limits itself to those facts relevant to the issues presented for its review. Plaintiff applied for DIB under Title II of the Social Security Act and for SSI under Title XVI of the Act on October 29, 2020. (R. 16, 246.) Plaintiff, then in her early twenties (R. 72, 91) alleged that she was disabled and unable to work as of March 15, 2020, (R. 16) when she stopped working full time as a house cleaner. (R. 44, 295). In her applications, Plaintiff claimed she could not work because of her bipolar disorder, anxiety disorder, PTSD, polycystic ovary syndrome, endometriosis, narcolepsy, asthma, sleep apnea and mild scoliosis. (R. 67, 86.) The SSA denied Plaintiff's initial claims for both DIB and SSI (R. 83, 102) and affirmed those denials on reconsideration (R. 126–27, 147–48).

---

provision that the Court resolve the case on cross-motions for summary judgment. (Dkt. No. 16.) *See* D. Minn. LR 7.2(c) (2015).

Plaintiff appealed to an ALJ, who held a hearing where Plaintiff testified (R. 209, 214, 35–65). She recalled that she was fired from a job as a cashier for "excessive absenteeism" in 2019 (R. 49) and had reduced her hours as a house cleaner due to complications from bipolar disorder and narcolepsy in 2021. (R. 41–44). Regarding her attendance at that time, she testified "I started—my alarm wasn't waking me up, so I was missing days of work. Not on purpose, but I couldn't wake up." (R. 45.) She eventually stopped working altogether in September of that year (R. 44.) When asked if she quit or was fired, she testified "I guess I quit. I had a bipolar swing and I didn't show up. I didn't answer the phone." (*Id.*) She reported looking for work but stopping herself from actually pursuing a job because of her bipolar disorder diagnosis: "I always overdo it and I think I can do something when I really can't. And then I end up losing the job, or quitting, or something happens. It's a pattern." (R. 49.)

Plaintiff testified about how her narcolepsy impacts her life. (R. 58.) She described that she has episodes of cataplexy—sudden attacks of muscle weakness—every day and the only way to prevent them is to take a nap, which then allows her to stay awake another hour before feeling drowsy again. (R. 49.) She estimated that she took one-hour naps five days per week. (R. 56.)

After Plaintiff's testimony, the ALJ questioned the vocational expert, Christine Fontane. (R. 60.)  Ms. Fontane testified, in part, that the customary break schedule in a workday is one break every two hours: a ten to 15 minute morning break, a 30 minute lunch break, and a ten to 15 minute afternoon break. (R. 62.) She also explained that, in her experience, workers in "unskilled" jobs cannot be off task more than 7 to 10 percent of the

time and absent more than one or two days a month. (R. 63.) After hearing the testimony and reviewing the record, the ALJ concluded that Plaintiff was not disabled under the Social Security Act and summarized her findings in a written decision. (R. 16–28.)

The ALJ's decision followed the five-step sequential analysis for Social Security disability determinations described in 20 C.F.R. §§ 404.1520 and 416.920. At each step, the ALJ considered whether Plaintiff was disabled based on the criteria of that step. If she was not, the ALJ proceeded to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity[3] since March 15, 2020. At step two, the ALJ found that Plaintiff had multiple severe impairments,[4] specifically anxiety, asthma, attention deficit hyperactivity disorder (inattentive type), bipolar disorder, depression, dissociative disorder, narcolepsy, post-traumatic stress disorder, and social anxiety disorder. (R. 19.) The ALJ found that

---

[3] If a claimant can engage in "substantial gainful activity" after their claimed onset of disability date, the SSA will find them not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). An individual is engaged in "substantial gainful activity" if their work "involves significant physical or mental activities." 20 C.F.R. §§ 404.1572, 416.972. The SSA considers an individual's earnings in determining whether their work rises to the level of "substantial gainful activity." 20 C.F.R. §§ 404.1574, 416.974 ("Generally, in evaluating your work activity for substantial gainful activity purposes, our primary consideration will be the earnings you derive from the work activity.")

[4] The SSA considers an impairment not severe if "it does not significantly limit [a claimant's] ability to do basic work activities," such as walking, standing, seeing, hearing, speaking, remembering, using judgment, and responding appropriately to the work environment. 20 C.F.R. §§ 404.1520(c), 404.1522, 416.920(c), 416.922. In contrast, a severe impairment must significantly limit a claimant's ability to do these activities, and the impairment must last at minimum 12 months. 20 C.F.R. §§ 404.1522, 416.922, 404.1509, 416.909.

Plaintiff's scoliosis, polycystic ovarian syndrome, endometriosis, and sleep apnea were not severe because the record showed that these conditions only slightly limited Plaintiff's ability to do "basic work tasks." (*Id.*)

Moving to step three, the ALJ consulted the listing of impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).[5] The ALJ concluded that none of Plaintiff's severe conditions met or medically equaled the severity of the listed conditions. (R. 19.) The ALJ specifically consulted the listings for mood, anxiety, and neurodevelopmental disorders in making her determination. (*Id.*); *see* 20 C.F.R. pt. 404, subpart P, app. 1, §§ 12.04 ("depressive, bipolar and related disorders"), 12.06 ("anxiety and obsessive-compulsive disorders"), 12.11 ("neurodevelopmental disorders"). Further, the ALJ considered the four "paragraph B" functional areas that ALJs use as part of their assessment of disability due to mental impairment. 20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3) (explaining that the four functional areas are "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself"). The ALJ found that Plaintiff had a mild[6] limitation in the first functional area and a moderate limitation in the second, third, and fourth functional areas. (R. 19–21.) For a mental impairment to be considered severe under

---

[5] The listings are a collection of criteria that the SSA uses to determine whether a particular condition "is severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525, 416.925. There are criteria for many different conditions. *See generally* 20 C.F.R. Part 404, Subpart P, Appendix 1.

[6] ALJs classify impairment in a functional area on a five-point scale: None, mild, moderate, marked, and extreme. 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(F)(2).

the "paragraph B" criteria, it must cause an extreme limitation in at least one functional area, or a marked limitation in at least two functional areas. 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00 (A)(2)(b). Because Plaintiff had no marked or extreme limitations, the ALJ concluded that the "paragraph B" criteria were not satisfied, and that Plaintiff's mental condition neither met nor equaled a condition in the listings. (R. 21.)  The ALJ also concluded that Plaintiff did not have a "serious and persistent mental disorder" as defined by the "paragraph C" criteria, an alternative to the "paragraph B" criteria. (R. 21) *See* 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00 (A)(2)(c), § 12.00G.

Next, the ALJ determined Plaintiff's residual functional capacity ("RFC") which is a measure of the "the most [she] can still do despite [her] limitations," before proceeding to step four. (R. 22.); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *accord Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) ("A claimant's residual functional capacity is a measurement of their ability to do sustained physical or mental work, despite their health limitations.") 20 C.F.R. §§ 404.1520(e) and 416.920(e) (showing that the RFC is calculated before step 4). The ALJ made the following findings:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with nonexertional limitations: never climb ladders, ropes, or scaffolds; can never be exposed to concentrated levels of extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, or other pulmonary irritants; and never be exposed to hazards such as moving machinery, unprotected heights, or occupational driving. The claimant is limited to simple, routine, and repetitive tasks, but not at a production rate pace (e.g., no assembly line work), and is limited to occasional interaction with coworkers, supervisors, and the general public. The claimant can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment.

6

In determining Plaintiff's residual functional capacity, the ALJ found that Plaintiff's medically determinable impairments could reasonably cause her symptoms but that her statements about the "intensity, persistence, and limiting effects" of her symptoms were "not entirely consistent" with the medical and other evidence (e.g. activities of daily living, effect of medication on the conditions, effect of treatment on the conditions). (R. 22–23.) The ALJ noted that Plaintiff's symptoms fluctuated but responded to medication adjustments (R. 24) and that she received limited treatment for her conditions during the relevant time period (R. 26).

At step four, the ALJ found that Plaintiff could not do any of her past relevant jobs given her new RFC. (R. 26); *see* 20 C.F.R. §§ 404.1520(f) and 416.920(f). Plaintiff had prior work experience as a house cleaner, resident assistant at an assisted living community, and as a cashier and stockroom worker. (R. 49, 295–96.) In deciding that Plaintiff could not do any of her relevant past work, the ALJ considered the opinion of Ms. Fontane, the vocational expert. (R. 26, 61.) At the fifth and final step, the ALJ found that Plaintiff was not disabled based on Ms. Fontaine's testimony that there were jobs in the national economy that could accommodate a person of Plaintiff's age, education, work experience, and RFC, for instance, automotive detailer (DOT # 915.687-034, with 125,000 jobs nationwide) and laundry worker (DOT # 361.685-018, with 50,000 jobs nationwide). (R. 27.); *see* 20 C.F.R. §§ 404.1520(g) and 416.920(g). Plaintiff appealed the ALJ's ruling to the SSA's Appeals Council. (R. 1, 8, 366) She argued that the ALJ erred by (1) failing to describe her findings in such a way as to allow for further review, (2) not accounting for

the limitations of Plaintiff's mental health impairments, (3) not properly considering the medical opinion evidence submitted, (4) excluding limitations recommended by Plaintiff's therapist and advanced practice nurse, (5) and failing to account for all the limitations that stem from the conditions that the ALJ found to be severe. (R. 366.) The Appeals Council denied her request for review (R. 1.). This denial made the ALJ's decision the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 106 (2000); *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

Plaintiff filed a complaint in United States District Court and the Commissioner filed her answer and the administrative record. (Dkt. Nos. 1, 14, 15.) The case is before this Court on the parties' cross-motions for summary judgment, which are fully briefed and ready for review. (*See* Dkt. Nos. 17, 20.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited. The district court "reverses the findings of the Commissioner only if they are unsupported by substantial evidence or result from an error of law." *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g)). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). The Court must examine "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). The Court may not reverse the ALJ's decision simply because substantial evidence would

support a different outcome or because the Court would have decided the case differently.
*Id.* (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)). In other words, if it is
possible to reach two inconsistent positions from the evidence and one of those positions
is that of the Commissioner, the Court must affirm the decision. *Robinson v. Sullivan*, 956
F.2d 836, 838 (8th Cir. 1992).

A claimant has the burden of proving disability. *See Roth v. Shalala*, 45 F.3d 279,
282 (8th Cir. 1995). To meet the definition of disability for DIB and SSI, the claimant must
establish that she is unable "to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than
12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The disability, not just the
impairment, must have lasted or be expected to last for at least twelve months. *Titus v.
Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

Plaintiff was last insured for DIB purposes on September 30, 2021[7] (R. 18, 70, 89)
so she must establish that she became disabled on or before that date. *Pyland v. Apfel*, 149
F.3d 873, 876 (8th Cir. 1998). Thus, the relevant time period for Plaintiff's DIB claim is

---

[7] DIB is a social insurance program, limited to nonelderly, disabled people who have paid
sufficient social security taxes (by working and having social security taxes withheld from
their pay) to qualify for coverage, that covers individuals when they become disabled.
William R. Morton, Cong. Rsch. Serv., R44948, *Social Security Disability Insurance and
Supplemental Security Income: Eligibility, Benefits, and Financing* 1 (2018). The number
of fiscal quarters that a person has paid into the program determines their "date last
insured." *See Wallace v. Astrue*, No. 10-CV-342 (JRT/FLN), 2011 WL 2014884, at *1 n.2
(D. Minn. May 23, 2011). SSI, by contrast, is a need-based public assistance program.
Morton, at 14. A claimant can apply for both DIB and SSI. *Id.* at 34.

from March 15, 2020 (the alleged disability onset date) to September 30, 2021 (her date last insured). SSI benefits are not payable before an application is filed, 20 C.F.R. § 416.335, so the relevant time frame for Plaintiff's SSI claim is from October 29, 2020 (the date of the SSI application) to September 27, 2021 (the date of the ALJ's decision). (R. 16, 28.) *See Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989) (using SSI application date to mark the beginning of the relevant time period); *Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013) (using the date of the ALJ's decision on the SSI claim to mark the end of the relevant time period).

### III.   Analysis

Plaintiff argues that the ALJ made two errors in deciding her case. (Pl.'s Mem. Supp. Summ. J. 2, hereinafter "Pl.'s Mem.," Dkt. No. 17.) First, Plaintiff claims that the ALJ did not "properly evaluate" the opinions of Plaintiff's treating therapist and advance practice nurse, resulting in an inaccurate RFC and an incorrect finding that Plaintiff is not disabled. (*Id.* at 12.) Second, Plaintiff alleges that the ALJ did not fully consider Plaintiff's narcolepsy diagnosis when she formulated Plaintiff's RFC. (*Id.* at 3.) The Court takes each claim of error in turn.

### A.   The ALJ's Opinion Failed to Fully Articulate Why She Found the Opinions of Plaintiff's Therapist and Advance Practice Nurse to Not Be Persuasive.

The ALJ found that the medical source statements from Plaintiff's treating therapist and advanced practice nurse were not persuasive, at least in part, because they were not supported by the evidence in the medical record. (R. 25.) Plaintiff disagrees with the ALJ's analysis. (Pl.'s Mem. 18.) Had the ALJ given the opinions of these professionals due


consider how "persuasive" an opinion or finding is according to five factors: supportability, consistency, relationship with the claimant, specialization, and any other relevant factors. 20 C.F.R. § 404.1520c(c)(1)–(5), § 416.920c(1)–(5). The "most important factors" are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2), § 416.920c(b)(2); *accord Michael B. v. Kijakazi*, No. 21-CV-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022).

As this Court recently explained, the factor of supportability measures how well the opinion *supports itself* with objective "medical evidence and supporting explanation[]," while the factor of consistency measures how well the opinion *is supported by other evidence* in the record, including medical opinions, prior administrative findings, and non-medical sources. *John P. B. v. Kijakazi*, No. 22-CV-1801 (MJD/JFD), 2023 WL 5516154, at *6 (D. Minn. July 17, 2023), *R&R adopted*, 2023 WL 5515986 (D. Minn. Aug. 25, 2023). While the relationship of the medical professional to the claimant is a consideration, the fact the professional has treated the claimant does not, by itself, make the professional's opinion entitled to deference. *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022); 20 C.F.R. §§ 404.1520c(a). 416.920c(a).

In this case, the ALJ considered the opinions of the state psychological consultants, state medical consultants, Plaintiff's treating advanced practice nurse, Ms. Brown, and Plaintiff's treating therapist, Ms. Lorsung. (R. 23–25.) Medical opinion evidence and prior administrative medical findings are treated equally under § 404.1520c and § 404.1520c.

ii.   *The ALJ's Assessment of Nurse Brown's Medical Source Statement is Incomplete.*

Nurse Brown completed a check-the-box medical source statement in July 2021. (R. 985.) After listing Plaintiff's current diagnoses, Nurse Brown wrote "inability to work" was a psychosocial or contextual factor for her diagnoses. (*Id.*) Nurse Brown opined that Plaintiff would have a marked limitation in her "ability to tolerate normal levels of stress," "maintain attention and concentration for more than two-hour segments," "complete a normal work day and work week, without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods." (R. 986.) She wrote that Plaintiff would require unscheduled breaks beyond the traditional morning, afternoon, and lunch break: "[She would l]ikely need a break every 2 hours due to inability to concentrate, tolerate disruption, anxiety-break would be 15–30 min." (R. 987.) She noted that Plaintiff would miss more than three days of work per month and had a history of "missing appointments due to inability to deal with the day's demands." (R. 987.) The ALJ found Nurse Brown's opinion to be "not entirely persuasive" because it was not "supported by the medical evidence of record." (R. 25.) Specifically, the ALJ found "no evidence to suggest excessive absenteeism," noting instead that Plaintiff was able to continue working part time for months after she reduced her hours. (*Id.*)

Plaintiff retorts that it is "simply wrong" for the ALJ to say there is no evidence of excessive absenteeism. (Pl.'s Mem. 18.) She points the Court to her own testimony that she was fired for excessive absenteeism in 2019 (R. 49), a clinical note that summarizes her opinion that her "daytime tiredness has made it difficult for her to pursue further schooling or hold a job," (R. 375), a clinical note documenting her report that she can "sleep for 18 hours and still . . . not wake up easily to her alarm," (R. 412) and a diagnostic assessment

where her therapist documented her reports of oversleeping even after setting multiple alarms or asking her partner to wake her up (R. 1160). The Court agrees that these portions of the record contradict the ALJ's broad statement ("There is no evidence . . ."), which it understands to be critiquing the consistency of Nurse Brown's opinion with the record evidence. *See*   20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions or prior administrative medical finding(s) will be.").

The ALJ did not make her consistency analysis clear. For example, she did not explain that the references suggesting excessive absenteeism repeated Plaintiff's subjective complaints. *See B.-I. v. Kijakazi*, No. 21-CV-0238 (ECT/JFD), 2022 WL 1423595, at *10 (D. Minn. Apr. 19, 2022), *R&R adopted*, 2022 WL 1423313 (D. Minn. May 5, 2022) ("An ALJ may reduce the persuasive value of an opinion that is based largely on a claimant's subjective complaints."). Instead, she made a broad statement that is not supported by the substantial evidence. This was a legal error. *John P. B. v. Kijakazi*, 2023 WL 5516154, at *7 ("An ALJ 'will explain how [she] considered the supportability and consistency factors . . . .'" (quoting 20 C.F.R. §§ 404.1520c(b)(2)).) On remand, the ALJ will articulate how she evaluated the distinct factors of consistency and supportability of Nurse Brown's medical source statement.[10] In considering whether Nurse Brown's assessment is

---

[10] Plaintiff made two additional arguments the Court will address briefly. The ALJ defended her RFC by saying that a normal work day would accommodate a break every two hours, as Nurse Brown prescribed, but the ALJ did not acknowledge that Nurse Brown also said that Plaintiff's "anxiety breaks" could be 15 to 30 minutes long. (R. 25.) The

consistent with the record evidence, the ALJ can consider the fact that Petitioner worked part time despite her impairments, *see Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004), and can certainly ignore Nurse Brown's conclusory opinion on whether or not Plaintiff is able to work, because that is a finding reserved for the Commissioner. *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010).

       iii.     *The ALJ's Assessment of Ms. Lorsung's Medical Source Statement is Also Incomplete.*

Ms. Lorsung completed her own check-the-box medical source statement in August 2021. (R. 1152.) In a cover letter attached to the statement, Ms. Lorsung wrote, "it is my clinical opinion that [Nicole M.] is significantly impaired by the symptoms of the above mentioned diagnoses and is unable to work in a competitive and sustained basis . . . . In

---

vocational examiner testified that a break every two hours is normal, with a ten to 15 minute morning and afternoon break and a 30 minute lunch. (R. 62.) The ALJ did not ask the vocational examiner about the possibility of longer breaks. (*Id.*) Thus, the ALJ correctly stated in her written opinion that the *number* of breaks Nurse Brown said Plaintiff might need was consistent with the normal workday, but the *duration* of the breaks Nurse Brown said Plaintiff might need is outside the parameters to which the vocational examiner testified. The Commissioner argues that nothing in the record corroborates a need for breaks greater than fifteen minutes and that no state evaluators found they were necessary. (Def.'s Mem. 9.) If the ALJ did not address the duration of breaks because she found Nurse Brown's opinion to be inconsistent with the record, as the Commissioner suggests, the Court trusts that the ALJ will say so on remand.

      The ALJ also defended the RFC by saying that it accommodated Plaintiff's "difficulty adjusting to work-related changes." (R. 25.) Plaintiff retorts that Nurse Brown and Ms. Lorsung both found that Plaintiff had either marked or extreme limitation in tolerating workplace *stress*, and that the RFC did not include stress-related limitations. (Def.'s Mem. 19.) The Court notes that one of the state reviewing psychologists—whose opinion the ALJ found persuasive—did opine that Plaintiff could handle a job with routine and repetitive tasks, which is what the RFC accommodated. (R. 22, 124.) The RFC was supported by substantial evidence in this respect.

addition, I am recommending that [Nicole M.] complete neuropsychological testing to further quantify her impairment and assist in the determination related to her disability." (R. 1152.) Ms. Lorsung clarified her recommendation for additional testing in the medical source statement: "Neuropsych testing would provide more detailed information regarding client deficits related to attention, memory, concentration and perception including psychotic symptoms." (R. 1154.) Ms. Lorsung's assessments of Plaintiff's impairments were more pessimistic than Nurse Brown's; she opined that Plaintiff had a "marked" or "extreme" limitation in all the mental activities and functions listed in the medical source statement, from "remember[ing] locations and work-like procedures" to "ability to tolerate normal levels of stress." (R. 1153–54.) She reported that Plaintiff would need more than the normal morning, lunch, and afternoon breaks but was "unable to specify" how many would be needed. (R. 1155.) She also could not estimate how many days she might be absent. (*Id.*)

The ALJ found this opinion to be unpersuasive because the "degree of limitation is not supported by the medical evidence," because Plaintiff worked part time. (R. 25.) As with Nurse Brown's opinion analyzed above, the ALJ appears to be critiquing the consistency of Ms. Lorsung's opinion without explicitly saying so. Again, the Court agrees that the ALJ could properly consider the fact that Plaintiff worked in evaluating whether Ms. Lorsung's opinion was consistent with the record evidence, *see Harris v. Barnhart*, 356 F.3d at 930, and ignore Ms. Lorsung's conclusory opinions as to the ultimate issue, but the Court hesitates to read-in a consistency analysis where one does not exist. Thus,

remand is appropriate for the ALJ to consider the opinion's consistency and supportability, as distinct factors.[11]

### B. The Effect of Plaintiff's Narcolepsy was Properly Accounted for in the RFC, and that Portion of the RFC was Supported by Substantial Evidence.

Plaintiff argues that even though the ALJ found Plaintiff's narcolepsy to be a "severe" impairment, the ALJ still did not "fully account" for the effects of the disease when the ALJ formulated the RFC. (Pl.'s Mem. 3.) According to Plaintiff, the RFC does not recognize that she "is simply unable to reliably get through even the minimal requirements of her daily life without frequent interruptions by fatigue and/or the need to sleep during the day," which would make her off-task at any job. (*Id.* at 10–11.) On Plaintiff's view, this tendency to get off task would prohibit her from engaging in full time employment with the normal breaks described by the vocational examiner. (*Id.* at 11.) Thus, Plaintiff argues, the ALJ's denial of benefits is not supported by substantial evidence and should be remanded. (*Id.* at 4, 11–12.)

The Commissioner acknowledges that the ALJ found Plaintiff's narcolepsy to be a severe impairment but claims that the ALJ accounted for it in the RFC by including those limitations that were supported by the medical record. (Def.'s Mem. 4.) The Commissioner

---

[11] Plaintiff and the Commissioner disagree about whether Ms. Lorsung's reference to more tests should render her opinion less persuasive. (Pl.'s Mem. 18–19; Def.'s Mem. 9.) The ALJ made the logical inference from Ms. Lorsung's statements about further testing that her opinion was not comprehensive because it could be supplemented with additional information, namely the results of neuropsychological testing. This goes to the supportability of Ms. Lorsung's opinion. The fact that relevant tests were not available for Ms. Lorsung to opine on could have suggested to the ALJ that her findings were not well supported. If this is the case, the Court is confident that the ALJ will say so.

argues that the ALJ's decision not to include off task limitations was supported by substantial evidence because clinical notes show that Plaintiff can stay awake from 6 or 7 am to 6 pm and the State's experts did not support such limitations. (*Id.* at 4–6.) The Commissioner notes that the ALJ found those sources that advocated greater limitations in this regard—Nurse Brown and Ms. Lorsung— to not be persuasive on this point (*Id.* 7 n.5.).

The Court finds that substantial evidence supports the ALJ's accommodations for Plaintiff's narcolepsy in the RFC. Plaintiff's therapist did report daytime sleeping episodes in March 2019 (R. 836) but that was before Plaintiff had a sleep study and started treatment for her narcolepsy (R. 72, 91 (noting care for narcolepsy started in March 2020)). In November 2020, Plaintiff was not taking naps while on her stimulant medications. (R. 72, 91, 375). In May 2021, Plaintiff reported that her Ritalin dose lasted from 6 or 7 am to 6 pm. (R. 990.). Furthermore, the state medical consultants also noted Plaintiff's improvement on medication (R. 72, 120–21) and did not advocate for any of the broader limitations Plaintiff now seeks. (R. 76–78, 120–21.) Taken together, these facts constitute substantial evidence to support the ALJ's decision not to include a limitation for excess "off task time" in Plaintiff's RFC.[12]

---

[12] The Court finds that substantial evidence supports the RFC's accommodation of narcolepsy irrespective of how the ALJ assesses the consistency and supportability of Nurse Brown and Ms. Lorsung's opinions on remand.

**IV.     Conclusion**

Accordingly, based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.     Plaintiff's Motion for Summary Judgment (Dkt. No. 17) be **GRANTED IN PART AND DENIED IN PART** as described above;

2.     Defendant's Motion for Summary Judgment (Dkt. No. 19) be **GRANTED IN PART AND DENIED IN PART** as described above;

3.     The Commissioner's decision be **REMANDED** for further analysis of the consistency and supportability of the medical source statements of Nurse Brown and Ms. Lorsung, as described above; and

4.     **JUDGMENT BE ENTERED ACCORDINGLY**.


Date: September 15, 2023                               _s/ John F. Docherty_
                                                        JOHN F. DOCHERTY
                                                        United States Magistrate Judge